540 P.2d 136

**The STATE of Arizona, Appellee,**

**v.**

**Richard K. BROSIE, Appellant.**

**No. 2 CA–CR 496.**

Court of Appeals of Arizona,
Division 2.

Sept. 11, 1975.

Rehearing Denied Oct. 15, 1975.

Review Granted Dec. 2, 1975.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Grove M. Callison, Asst. Attys. Gen., Phoenix, for appellee.

John M. Neis, Pima County Public Defender by Frederic J. Dardis, Asst. Public Defender, Tucson, for appellant.

## OPINION

KRUCKER, Judge.

Appellant, Richard K. Brosie, was charged with first-degree murder and assault with a deadly weapon. After a three-week trial, the jury convicted him of voluntary manslaughter with a gun. The trial court entered a judgment in accordance with the verdict and sentenced him to a term of 15 to 30 years in the Arizona State Prison. From the judgment and sentence, appellant brings this appeal. We affirm.

Appellant raises six contentions on appeal. They are as follows: (1) That certain statements of appellant were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and should have been excluded from evidence; (2) that the trial court erred in refusing to excuse two jurors after defense counsel challenged them for cause pursuant to Rule 18.4(b), Rules of Criminal Procedure, 17 A.R.S.; (3) that the trial court incorrectly instructed the jury on the insanity defense; (4) that the trial court erred in refusing to instruct the jury not to convict on mere suspicion or probabilities; (5) that the trial court erred in refusing to allow appellant to introduce testimony contradictory to that of his former wife for the purpose of impeaching her credibility; and (6) that the trial court imposed an excessive sentence.

The material facts are as follows. Appellant, an enlisted man in the United States Army, married Pat Brosie while on leave in July, 1973. At that time, she was the mother of a six-weeks-old baby. After appellant returned to Korea, his wife moved in with Albert Gough, the decedent. She soon wrote to appellant and told him she wanted a divorce. Appellant returned home immediately.

Divorce proceedings were commenced and the matter was litigated. Gough frequently accompanied Pat to court. During this period Gough threatened appellant's life.

On April 26, 1974, appellant went to the house where Gough and Pat were living. He brought a gun with him. Pat informed him that the baby was not his and that she and Gough intended to marry and change the baby's name. A scuffle ensued and the gun discharged, hitting Gough. Pat pushed appellant out the door, locked it, and called the police. She then called a friend and asked her to come immediately. While she was speaking to her friend, appellant broke a window and entered the house. He hung up the phone and ordered Pat to get a knife and stab Gough. When she refused, appellant hit her on the head with a lamp and forced her to write a note stating that she killed Gough. While she was writing, appellant stabbed Gough 48 times, listening periodically to his heart.

Appellant directed Pat to get the baby and come with him. As he waited for her in the kitchen, Tucson police officers arrived and arrested him. Officer Zimmerman handcuffed appellant and then took him through the house and out the front door. When they were outside, Officer Zimmerman started to advise appellant of his *Miranda* rights. Halfway through the recitation, appellant commenced to repeat the *Miranda* rights along with Officer Zimmerman. Appellant said that he understood his rights. Zimmerman placed appellant in a marked patrol car. Detective Reyna, a plainclothesman, moved appellant to an unmarked car shortly thereafter. Appellant told Reyna he had already received his rights. He testified that he gave Detective Reyna a card with his attorney's name and phone number on it. Detective Reyna did not recall ever receiving such a card. Appellant indicated he would answer questions. At no time did he request that his attorney be present. Reyna recorded appellant's statement on tape.

Appellant was then taken to the police station. There he made two more statements. During this time, Detective Reyna unsuccessfully attempted to reach appellant's attorney. While he was being ques-

tioned, appellant was calm and appeared to understand what was happening. He never asked for his lawyer or indicated that he would like the questioning to stop. On the way to the sheriff's office after questioning, appellant asked to speak to his attorney.

After a voluntariness hearing, the trial court found that appellant knew and understood his rights and had voluntarily waived them. The trial court accordingly permitted the State to introduce appellant's statements into evidence. Appellant contends that this was error. We cannot agree. It is the function of the trial court to determine factual disputes in voluntariness hearings. Where conflicting inferences can be drawn from the evidence, we must view it in the light most favorable to sustaining the trial court's findings. *State v. Dean*, 8 Ariz.App. 508, 447 P.2d 890 (1968). Moreover, we will not disturb the trial court's findings if they are supported by substantial evidence. *State v. Mumbaugh*, 107 Ariz. 589, 491 P.2d 443 (1971). *See State v. Richmond*, 23 Ariz.App. 342, 533 P.2d 553 (1975); *State v. Robinson*, 9 Ariz.App. 379, 452 P.2d 706 (1969). Here, the question of whether appellant's statements were taken in violation of *Miranda v. Arizona*, supra, turns on whether appellant knew he had the right to have his attorney present during questioning and, if so, whether he voluntarily relinquished that right.

We think it is clear that appellant knew he had a right to the presence of an attorney. He had himself given the *Miranda* warnings in the Army from memory. In addition, he stated more than once he understood them. The evidence of waiver is less clear, but we think it amply supports the trial court's finding. Assuming that appellant gave Detective Reyna his attorney's card before or during the questioning, we do not think the giving of such a card, without more, amounts to a request for an attorney. This conclusion is supported by the fact that appellant stated he would waive his rights and try to answer

Detective Reyna's questions as best he could. Further, there was credible testimony from which the trial court could reasonably have concluded that appellant never asked for his attorney to be present. We think the trial court's finding that appellant voluntarily relinquished his right to the presence of counsel during questioning was supported by substantial evidence and is not clearly erroneous. *State v. Robinson*, supra. The trial court did not err in admitting appellant's statements into evidence.

Appellant next contends that the trial court erred in refusing to excuse two jurors after defense counsel challenged them for cause pursuant to Rule 18.4(b), Rules of Criminal Procedure, 17 A.R.S. On voir dire, one of the veniremen, a Mr. Villa, stated that he and Gough, the decedent, had both been employed by the Tucson Parks and Recreation Department and had worked together occasionally. He stated further that everyone at work knew Gough was seeing Pat Brosie and that he himself had seen them together twice. When he heard of Gough's death, he assumed Pat's husband had done it. Villa finally stated that he felt this knowledge would not prejudice him against appellant.

Another juror, a Mr. Rogers, was a highway patrolman and knew the prosecuting attorney by sight. He said he thought police officers generally had better access to the facts than other witnesses, but that his view of a particular witness would depend on the facts of the case. He stated he would follow the court's instructions concerning the credibility of witnesses.

The central issue on a challenge for cause is whether there exists "reasonable ground to believe that a juror cannot render a fair and impartial verdict . . . ." Rule 18.4(b), Rules of Criminal Procedure, 17 A.R.S. Because the trial court is in a position to determine at first hand whether such reasonable ground exists, the decision whether to sustain a challenge for cause is within the court's sound discretion. *State v. Hilliard*, 89 Ariz. 129,

359 P.2d 66 (1961). Its decision will not be disturbed on appeal unless there is a clear showing that it abused its discretion. *State v. Duke*, 110 Ariz. 320, 518 P.2d 570 (1974); *State v. Narten*, 99 Ariz. 116, 407 P.2d 81 (1965); *State v. Hilliard*, supra. No such showing has been made here. It is true that Mr. Rogers knew the prosecutor by sight. This, however, is insufficient to show he was prejudiced. *State v. Benge*, 110 Ariz. 473, 520 P.2d 843 (1974). Mr. Rogers' opinion that police officers have better access to the facts is also insufficient to show prejudice, especially in view of his expressed willingness to follow the court's instructions and determine the credibility of each witness according to the facts of the case.

Mr. Villa had a certain degree of familiarity with Gough and Pat Brosie. In addition, when he heard of Gough's death, Mr. Villa assumed that Pat's husband had killed him. We think that mere familiarity with the persons involved does not indicate prejudice. We also think the trial court could reasonably have concluded that Mr. Villa's attitude toward the relationship between Gough and appellant's wife was essentially disinterested and that the inference Mr. Villa drew concerning the death of Gough was therefore casual and impermanent. Furthermore, Mr. Villa stated several times in response to questions from the court and trial counsel that what he knew would not prejudice him or affect his deliberations. On this record, we cannot say the trial court abused its discretion in refusing to excuse Mr. Villa and Mr. Rogers.

We next consider appellant's contention that the trial court wrongly instructed the jury on the defense of insanity. The trial court instructed the jury as follows:

"The State must prove beyond a reasonable doubt that the defendant was sane. If you determine the defendant did not know right from wrong, *or if you determine that he did not know the probable results of his acts*, then he was not sane. If you determine the defendant was not sane you must find him not guilty by reason of insanity." (Emphasis added)

Appellant contends the language "probable results of his acts" was incorrectly substituted for "nature and quality of his acts" in the classic formulation of the M'Naghten rule as applied in Arizona. *See, State v. Schantz*, 98 Ariz. 200, 403 P. 2d 521 (1965).

We note that the trial court's instruction was taken virtually verbatim from Recommended Arizona Jury Instructions, Criminal Defenses, No. 5 (hereinafter R.A.J.I. # 5). R.A.J.I. # 5 lists as authority the Arizona case of *State v. Macias*, 60 Ariz. 93, 131 P.2d 810 (1942). In *Macias* our Supreme Court sustained an instruction containing this language:

" . . . if he understood and appreciated the nature and character of his action *and its consequences*; and if he had knowledge that his acts were wrong and criminal . . . ." (Emphasis added) 60 Ariz. at 96, 131 P.2d at 811.

*Macias* clearly provides some support for the "probable results" language of R.A.J.I. # 5. We also note that our Supreme Court has expressed "qualified approval" of all the instructions in R.A.J.I. We think this qualified approval strongly indicates that the court views R.A.J.I. # 5 as an adequate statement of Arizona law. We think the shift from the "nature and quality" of a defendant's act to the "probable results" of the act is not a deviation from the Arizona rule but a clarification of it. "Probable results" is not intended to refer to the remote, future consequences of a person's overall course of action. It refers instead to the immediate tangible effects of a person's physical movements. To say that a person is aware that his physical acts will produce certain immediate tangible effects is merely to say in concrete terms that he understands their essential nature. The effect of R.A.J.I. # 5 is to relieve the jury of the task of debating whether a defendant appreciated the abstract "nature and quality" of his act and

to focus its attention on whether he understood the immediate consequences of his acts in the real world. We therefore think that R.A.J.I. # 5 correctly states the substance of the *M'Naghten* rule and constitutes a practical improvement on the traditional formulation. The trial court did not err in giving R.A.J.I. # 5.

 Appellant next contends that the trial court erred in refusing to give his requested instruction that no conviction can stand on mere suspicion, probabilities or supposition. We disagree. The trial court instructed the jury that it must not guess about the facts and that the State must prove defendant guilty beyond a reasonable doubt. We think these instructions adequately conveyed to the jury the substance of appellant's requested instruction.

At the trial Pat Brosie testified that she never had sexual intercourse with Tom Kennedy while married to appellant. Appellant sought to have Kennedy testify that she had in fact had sexual intercourse with him during that time. The trial court granted the State's motion in limine to exclude Kennedy's testimony and appellant now contends this was error. We think it was not. In *State v. Mangrum*, 98 Ariz. 279, 403 P.2d 925 (1965), our Supreme Court stated:

> "Contradiction on irrelevant collateral matters is not permissible. The test as to whether testimony offered in contradiction is admissible is would it be admissible for some purpose other than the mere contradiction . . . ." 98 Ariz. at 286, 403 P.2d at 930.

Here, appellant sought to introduce Kennedy's testimony to contradict that of Pat Brosie. Pat Brosie's relationship with Kennedy was not material to the case, hence Kennedy's testimony was not independently admissible. Under *Mangrum* the trial court properly excluded it.

Appellant finally contends that the trial court imposed an excessive sentence. We may not disturb a lawful sentence unless it clearly appears from the record that the sentence is too severe. *State v. Bustamante*, 11 Ariz.App. 129, 462 P.2d 822 (1969). Here, the record shows that appellant committed a savage killing. From the pre-sentence report, the trial court could have concluded that appellant is dangerous and should be incarcerated for a long period of time to protect the public. We think the sentence was not excessive. Complaints concerning overcrowding at the state prison and lack of available treatment are better addressed to the legislature than to us.

Affirmed.

HOWARD, C. J., and HATHAWAY, J., concur.